Hattie Delores **FARRAR**, Plaintiff,

v.

**DOROTHEA DIX HOSPITAL**, Defendant.

No. 91–809–CIV–5.

United States District Court,
E.D. North Carolina,
Raleigh Division.

June 16, 1993.

---

**142**

Hattie Delores Farrar, pro se.

Victoria L. Voight, Asst. Atty. Gen., N.C. Dept. of Justice, Raleigh, NC, for defendant.

### ORDER

DUPREE, District Judge.

Plaintiff, Hattie Delores Farrar, brings this pro se action alleging that she was discharged from her employment with defendant, Dorothea Dix Hospital (DDH), and subjected to racially disparate discipline on account of her race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* As relief, plaintiff seeks monetary damages. The matter is presently before the court on defendant's motion for summary judgment. Plaintiff has filed a response and the matter is now ripe for ruling.

Plaintiff was employed by defendant as a health care technician from August 1, 1975 until May 8, 1990. Prior to her dismissal plaintiff worked in Ward 303 South in the McBryde Building at DDH which housed approximately thirty-five patients with chronic mental illnesses. Her duties consisted of helping the lead nurse, Ann Satterwhite, tend to the patients' bathing, feeding and dressing needs. Plaintiff was assigned to the second shift which lasted from 3:45 p.m. until 12:15 a.m. The other employees regularly assigned to work with plaintiff on this shift were Patricia McNeil, a black female, Yvonne DeGraffenreid, a black female, and Ann Strickland, a white female. McNeil served as the lead technician for Ward 303 South and was therefore responsible for preparing the time schedules and work assignments as well as supervising the work of the technicians under her. She was also responsible for insuring that the time sheets were adequately filled out. Satterwhite, a white female, was plaintiff's immediate supervisor and also the supervisor for the entire ward. Satterwhite's supervisor was Lillian Massey, a black female.

Under DDH policy employees were required to inform their supervisor by telephone when they knew they were going to be more than five minutes late for work. Hospital policy further provided that employees who were tardy in arriving at work twice in one week, four times in a month, or six times in two months could be subjected to disciplinary action. Between January 22, 1982 and April 3, 1990 disciplinary action was taken against plaintiff on at least nine different occasions for tardiness, neglect of work, failure to complete work assignments, patient neglect, failure to attend staff meetings and insubordination. This disciplinary action was in the form of oral warnings, two regular

written warnings, a three-day suspension, and three final written warnings.

In May of 1990 plaintiff was given the option of resigning from her job or being fired.[1] Plaintiff chose to resign and defendant agreed that her employment would end on May 22, 1990. However, after May 8, 1990 plaintiff failed to show up for work.

Following her dismissal plaintiff did not seek new employment until February of 1991 at which time she obtained temporary employment as a maid. From 1991 until the present she has been employed as a nursing assistant and a waitress.

In this action plaintiff alleges that she was subjected to more severe disciplinary action than white employees and that her ultimate termination was on account of her race.

■ On a motion for summary judgment a court must grant the motion if the pleadings, depositions, affidavits, interrogatory answers and admissions show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corporation v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When a proper summary judgment motion is made, the non-moving party must offer specific facts which indicate that there is a genuine issue to be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The facts and inferences to be drawn from the facts must be viewed in the light most favorable to the non-moving party. *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir.1990), *cert. denied*, 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991).

■ The analytical framework for resolving a claim brought under Title VII is well established. If a plaintiff is able to make out a prima facie case of discrimination, the burden shifts to defendant to articulate a legitimate non-discriminatory reason for the adverse conduct suffered by the plaintiff. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). If defendant meets this burden, plaintiff must then show that defendant's proffered reason is merely a pretext for discrimination. *Id.* at 256, 101 S.Ct. at 1095.

## I. *DISCRIMINATORY TERMINATION CLAIM*

■ In order to make out a prima facie case of discriminatory termination under Title VII, a plaintiff must establish the following elements: (1) plaintiff was a member of a protected group; (2) plaintiff was terminated; (3) plaintiff was qualified to remain in her position; and (4) the position remained open to similarly qualified applicants after plaintiff's dismissal. *McNairn v. Sullivan*, 929 F.2d 974, 979 (4th Cir.1991).

■ However, even assuming that plaintiff has made out a prima facie case of discriminatory termination, it is clear that defendant has articulated a legitimate non-discriminatory reason for her termination. The affidavits submitted by defendant show a pattern of tardiness, inappropriate conduct, and insubordination by plaintiff during her employment with DDH. Ann Satterwhite, lead nurse on the second shift for 303 North and 303 South in Residential Area I of DDH, testified in her affidavit that plaintiff violated

---

**1.** Section 9 of the Personnel Manual for the North Carolina Office of State Personnel states in pertinent part as follows:

Any employee, regardless of occupation, position or profession may be warned, demoted, suspended or dismissed by the appointing authority. The degree and type of action taken shall be based upon the sound and considered judgment of the appointing authority in accordance with the provisions of this policy.

The basis for any disciplinary action taken in accordance with this policy falls into one of the two following categories:

(1) Discipline imposed on the basis of job performance

(2) Discipline imposed on the basis of personal conduct.

The JOB PERFORMANCE category is intended to be used in addressing performance-related inadequacies for which a reasonable person would expect to be notified of and allowed an opportunity to improve. PERSONAL CONDUCT discipline is intended to be imposed for those actions for which no reasonable person could, or should, expect to receive prior warnings.

*Id.* at 2–3.

hospital policy by being tardy for work on a number of occasions without complying with the unit call-in policy, by being absent from her ward without permission, and by making inappropriate use of the break room. Affidavit of Satterwhite at 2–3. Satterwhite also testified that when these matters were brought to plaintiff's attention by her supervisors she was "disrespectful" and that her behavior was inappropriate. *Id.* at 3. Satterwhite further stated that these incidents of tardiness and violations of the rules— rather than plaintiff's race—were the cause of plaintiff's termination. *Id.* at 3–4.

Lillian Massey, Nurse Supervisor II on the second shift for Residential Area I in the Rehabilitation Division of the hospital, testified in her affidavit that she issued six warnings to plaintiff for repeatedly failing to report to work on time between October of 1988 and May of 1990. Affidavit of Massey at 2–3. Massey further stated that plaintiff was asked to resign due to "her continued failure to comply with the unit reporting policy." *Id.* at 3.

In her affidavit Patricia McNeil, a Health Care Technician II in the Residential Area of the Rehabilitation Division, testified that on a number of occasions she saw plaintiff arrive late for work and inaccurately fill out her time on the sign-in sheet. According to McNeil, plaintiff became "confrontational" when this matter was brought to her attention. Affidavit of McNeil at 1. McNeil further testified that on several occasions she witnessed plaintiff leaving the ward in violation of orders that she stay in the ward until her shift had ended. McNeil also testified that her attempts to counsel plaintiff were met by profanity and, on one occasion, a threat of violence on the part of plaintiff. *Id.* at 2. Defendant has also submitted the affidavit of Dottie Welker, Unit Nurse Manager for the Rehabilitation Division of DDH, who also testified that plaintiff's discharge was occasioned by her violations of policy and performance deficiencies. Affidavit of Welker at 2.

█ Since defendant has stated a legitimate non-discriminatory reason for plaintiff's termination, the burden shifts back to the plaintiff to show that defendant's stated reason is merely pretextual. *Ross v. Communi-*

*cations Satellite Corporation,* 759 F.2d 355, 365 (4th Cir.1985). Plaintiff does not dispute the fact that she received the disciplinary actions cited by defendant. *See* Deposition of Farrar at 115–49. Plaintiff has also admitted that she was tardy for work on several occasions. *Id.* at 119, 123, 143–46.

Plaintiff alleges that Ann Strickland, a white employee employed by DDH, was also tardy on a number of occasions but that she was not terminated. Plaintiff further alleges that Strickland falsified the sign-in records to hide her tardiness.

However, in her deposition plaintiff admitted that she did not know how long Strickland had worked for DDH or how many times Strickland was tardy. *Id.* at 18–19. Plaintiff further admitted that she was not aware whether Strickland had ever called in to give notice that she would be late. *Id.* at 19. With regard to her allegations that Strickland falsified the records to hide her tardiness by signing in the day before she was going to be late, plaintiff admitted that she never actually saw Strickland do so nor did she ever bring this allegation to the attention of her supervisors. *Id.* at 20. Finally, she admitted that she was unaware whether any of Strickland's absences from work were excused.

The affidavits submitted by defendant further discredit the notion that defendant's stated reason was pretextual. Satterwhite testified that while Strickland took a number of days of sick leave and vacation time between 1989 and 1990, Strickland was in general compliance with DDH policy. Affidavit of Satterwhite at 4. While Satterwhite stated that Strickland was counseled on two occasions with regard to her tardiness, Satterwhite testified that she was unaware of any incidents in which Strickland falsified her time sheets.

Massey testified that Strickland was treated no differently than any other employee in connection with the unit reporting policy. Affidavit of Massey at 4. Massey likewise stated that she had no knowledge of Strickland ever falsifying records and that it would be extremely difficult for any employee to do so without being detected. *Id.* This testimony was echoed by Patricia McNeil in her affidavit. Affidavit of McNeil at 2.

In response to plaintiff's allegations that Yvonne DeGraffenreid, a Health Care Technician I on 303 South, observed Strickland falsify the sign-in sheets, DeGraffenreid testified that she never observed such conduct nor did anyone ever tell her that Strickland had so acted. Affidavit of DeGraffenreid at 1. Finally, in her affidavit Strickland expressly denied that she had ever inaccurately recorded her arrival times on DDH's time sheets. Affidavit of Strickland at 1. Strickland further stated that the counseling sessions she participated in constituted the only disciplinary action she ever received as an employee of DDH.

There is no evidence that any supervisory employee at DDH was ever informed of the alleged falsifications by Strickland. Furthermore, other than plaintiff's unsubstantiated and conclusory accusations, there is no evidence that Strickland engaged in such action. In addition, plaintiff has admitted that she does not know how many times Strickland was late for work or whether Strickland ever was subjected to disciplinary action. The only evidence in support of plaintiff's contention is the affidavit testimony that Strickland received counseling on two occasions in connection with her tardiness. However, the evidence shows a far greater number of policy violations by plaintiff than by Strickland. While no evidence has been presented that would point to a pattern of violation of DDH policy on the part of Strickland, the affidavit testimony submitted by defendant along with plaintiff's disciplinary records show such a pattern as to plaintiff. The evidence is also clear that plaintiff was given several warnings in accordance with hospital policy that she would be terminated if she did not begin following the regulations.

■ Plaintiff also implies that because Jackie Avery and Maude Moore, two DDH employees with whom plaintiff often rode to work, were not fired for tardiness, defendant's stated reason for firing plaintiff is pretextual. However, in her deposition plaintiff stated that on occasion she took a taxicab to work and that she sometimes drove her own car to work. Deposition of Plaintiff at 64. Therefore, there is no evidence that the instances in which plaintiff was cited for tardiness occurred on the days she rode to work with Avery and Moore. Plaintiff testified in her deposition that both Moore and Avery told her that they were never confronted about their tardiness. *See id.* at 22–23. However, other than these hearsay statements plaintiff has provided the court with no admissible evidence as to the number of times Moore and Avery were tardy and whether they were ever reprimanded concerning their failure to follow the unit call-in policy. Furthermore, the record indicates that Avery and Moore—like plaintiff—are black. For these reasons plaintiff's allegations concerning Avery and Moore are not sufficient to support an inference that defendant's articulated rationale for plaintiff's termination is merely a pretext for racial discrimination against plaintiff.

In response to defendant's motion for summary judgment, plaintiff has submitted two affidavits. The first of these is plaintiff's own affidavit and contains nothing more than conclusory assertions that mirror her previous allegations. Consequently, this affidavit is not sufficient to withstand defendant's motion. *See White v. Boyle*, 538 F.2d 1077 (4th Cir.1976).

The second affidavit proffered by plaintiff is the affidavit of Larry Wells. In this affidavit Wells, plaintiff's boyfriend,[2] refers to the "abuse" and "harassment" plaintiff suffered during her employment with DDH despite her love for the job and competence in performing her employment duties. Affidavit of Wells at 1–2. Wells further testified that plaintiff was unfairly subjected to disciplinary action for her tardiness despite the fact that other tardy employees were not so disciplined. *Id.* at 2.

Defendant objects to consideration of Wells' affidavit by the court on the grounds that the testimony contained therein is not based on Wells' personal knowledge. Defendant has submitted the affidavit of Willie Parker, the Employee Relations Specialist at DDH, who testified that Wells was employed as a health care technician at DDH from June 16, 1980 through November 8, 1983. Affidavit of Parker at 1. Defendant also refers the court to plaintiff's deposition testi-

2. *See* Deposition of Plaintiff at 101.

mony in which she suggested that Wells' knowledge of her alleged mistreatment may have been based on information she told him. *See* Deposition of Farrar at 101–02.

■ Federal Rule of Civil Procedure 56(e) states in pertinent that "[s]upporting and opposing affidavits shall be made on *personal knowledge*, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." (Emphasis added.) Furthermore, the rule in this circuit is that a district court may not consider hearsay evidence which would be inadmissible at trial in evaluating a motion for summary judgment. *Maryland Highway Contractors Association v. State of Maryland,* 933 F.2d 1246, 1251 (4th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 373, 116 L.Ed.2d 325 (1991).

■ Since there is no basis for the court to find that Wells' affidavit is based on his own personal knowledge, his affidavit may not be considered under Rule 56(e). However, even if this testimony were sufficient under the rule, the court finds that Wells' testimony lacks specificity and is insufficient to raise a genuine issue of fact as to whether the stated reason for plaintiff's discharge was pretextual. Therefore, plaintiff's discriminatory termination claim must fail.

## II. *RACIALLY DISPARATE DISCIPLINE CLAIM*

■ Plaintiff has also attempted to show that she was subjected to more severe disciplinary measures—prior to her termination—than were white employees at DDH. In order to make out a prima facie case of racially disparate discipline under Title VII, a plaintiff must establish: (1) that she is a member of the class protected by Title VII; (2) that the prohibited conduct in which she engaged was comparable in seriousness to misconduct of employees outside the protected class; and (3) that the disciplinary measures enforced against her were more severe than those enforced against those other employees. *Cook v. CSX Transportation Corporation,* 988 F.2d 507, 511 (4th Cir.1993). While plaintiff alleges that she was treated differently than Avery, Moore and Strickland, the record reflects that Avery and

Moore are black. Therefore, to establish a prima facie case of racially disparate discipline, plaintiff must show that her instances of tardiness and other violations of DDH rules were similar in seriousness to those of Strickland and that the disciplinary action imposed against her was more severe than that imposed on Strickland. *See id.*

■ The record reflects that plaintiff received counseling sessions with Satterwhite which took place on February 1, 1990 and March 24, 1990 with regard to her violations of DDH policy. In her deposition plaintiff admits that these counseling sessions occurred and that she continued to disobey the orders of her supervisor even though her supervisor had the authority to issue those orders. Deposition of Farrar at 139–46.

As discussed in the foregoing analysis, plaintiff admitted that she does not know how many times Strickland was tardy, whether her tardiness was ever excused due to illness, or whether she ever complied with the unit call-in policy by calling in to give notice that she would be late. *Id.* at 19. Furthermore, while plaintiff alleges that Strickland disguised her tardiness by signing in on the time sheets the day before she would be late, she admits that she never saw Strickland do so and that she never brought this accusation to the attention of her supervisors. *Id.* at 20.

Defendant has submitted a copy of Strickland's attendance records which show that Strickland was counseled on two occasions by Satterwhite. On July 10, 1990 a counseling session took place on account of the fact that Strickland was more than five minutes late to work twice in one week. On April 25, 1991 a counseling session was held between the two for the same reason. These counseling sessions were conducted pursuant to DDH policy.

Satterwhite testified in her affidavit, however, that Strickland was in general compliance with the unit call-in policy. Affidavit of Satterwhite at 4. While Satterwhite further testified that Strickland took a number of vacation and sick days between 1989 and 1990, no evidence has been offered to show that these absences or any other conduct by Strickland—other than the tardiness resulting in the two counseling sessions—violated

DDH regulations. In fact, Massey expressly denied in her affidavit that Strickland was treated any differently than plaintiff in regard to violation of the unit call-in policy. Affidavit of Massey at 4.[3]

▮ Plaintiff also complains that she was denied a legislative pay increase in 1989. However, defendant has submitted a memorandum dated August 18, 1989 from the Division of Personnel Management Services of the North Carolina Department of Human Resources to Institution/Division Personnel Managers stating that although North Carolina had authorized an across-the-board salary increase of four percent effective July 1, 1989, the salary increase was inapplicable to employees who had been "involved in written disciplinary procedures." The memorandum further stated that this language had been interpreted by the Office of State Personnel as excluding employees with a final written warning in their files "dated July 1, 1987 up through August 10, 1989, and which are still under consideration in determining the disciplinary status of an employee."

A subsequent memorandum dated August 28, 1989 from Michael S. Pedneau, Hospital Director, to plaintiff explained that because she had received a final written warning during this period, she would not be eligible for the increase although future improvements in her work performance might restore her eligibility. A memorandum dated September 11, 1989 from Willie Parker, Employee Relations Specialist at DDH, to Pedneau contains a list of the DDH employees—including plaintiff—ineligible for the legislative salary increase. The employees on the list deemed ineligible consisted of four white females, six white males, four black females and seven black males.

The record shows that plaintiff did in fact receive a final written warning in June of 1989. Furthermore, the racial breakdown of the employees deemed ineligible for the pay increase suggests that plaintiff was treated no differently from white employees with similar disciplinary infractions on their record. Consequently, the court finds that plaintiff has failed to establish a prima facie case of racially disparate discipline.[4]

## III. CONCLUSION

Accordingly, for the foregoing reasons defendant's motion for summary judgment is granted as to each of plaintiff's claims and judgment will therefore be entered in favor of defendant.

---

**3.** While Wells' affidavit makes general assertions that plaintiff suffered a greater degree of harassment than other DDH employees, this testimony does not appear to be based on personal knowledge and thus is not sufficient to establish a prima facie case of racially disparate discipline. See F.R.Civ.P. 56(c). Furthermore, Wells' affidavit is lacking in specificity.

**4.** In her pleading plaintiff makes fleeting references to an incident which took place in 1981 in a different unit at DDH in which she was allegedly locked in a room by two nurses against her will. However, she has not alleged that this incident had anything to do with her race or that any of the individuals involved in her disciplinary actions and her ultimate termination were involved. Accordingly, this allegation is not relevant to plaintiff's Title VII claims against defendant and therefore will not be considered by the court.